IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

DARRELL W. DAY, JR. PLAINTIFF

V. Civil No. 2:25-cv-02096-TLB-MEF

FRANK BISIGNANO, Commissioner,
Social Security Administration DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Darrell Day, Jr., brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying his claims for a period of disability, disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

## I. Procedural Background

Plaintiff filed his applications for DIB and SSI on December 28, 2018, alleging disability since June 22, 2018, due to a broken clavicle status post-surgical intervention, depression, anxiety, high blood pressure, restless leg syndrome, and a femoral acetabular impingement. (ECF No. 8, pp. 103, 131, 423-429, 473, 483-484, 509-510). On his onset date, the Plaintiff was 25 years old. (*Id*. at 30). He possessed a high school education and past relevant work experience as a farm worker, palletizer, forklift operator, welder helper, and construction worker II. (*Id*. at 474, 485-490).

This case has a lengthy history at the agency level. On February 2, 2021 (ECF No. 8, pp. 161-171), and January 13, 2023 (*Id*. at 186-200), Administrative Law Judge ("ALJ") Bill Jones issued unfavorable decisions. These decisions were the subject of separate Appeals Council

Remand Orders dated February 28, 2022 (*Id*. pp. 177-180), and October 27, 2023 (*Id*. at 208-213), respectively.[1] Following the 2023 remand, the case was reassigned to ALJ Elisabeth McGee. Judge McGee held an administrative hearing on April 3, 2024. (*Id*. at 41-73). Plaintiff was both present and represented by counsel.

On June 11, 2024, ALJ McGee determined that the Plaintiff met the insured status requirements through December 31, 2022. (ECF No. 8, p. 19). She then identified a right clavicle fracture status post-surgical correction in 2018 with nonunion and subsequent surgery in January 2019; right hip acetabular impingement status post-surgical correction of a labral tear in December 2019; mild to moderate stenosis of the lumbar spine, degenerative joint disease ("DJD") and osteoarthritis of the left hip; obesity; anxiety; depression; and posttraumatic stress disorder ("PTSD") as severe impairments but concluded the Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*. at 19). Despite Plaintiff's impairments, ALJ McGee found he retained the residual functional capacity ("RFC") to perform light work requiring only occasional climbing, stooping, kneeling, crouching, and crawling; simple, routine, and repetitive tasks; usual work situations and routine work changes; and routine but superficial social interaction. (*Id*. at 21). With the assistance of a vocational expert ("VE"), she determined Plaintiff could perform work as a merchandise marker, mail sorter, and collator operator. (*Id*. at 31).

The Appeals Council denied Plaintiff's request for review on July 10, 2025. (ECF No. 8, pp. 8-12). Plaintiff subsequently filed this action on February 10, 2025. (ECF No. 2). Both parties have filed appeal briefs (ECF Nos. 10, 13), and the matter is now ready for Report and Recommendation.

[1] ALJ Jones held an administrative hearing on June 23, 2022. (ECF No. 8, pp. 74-97).

## II. Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm an ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record to support the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial

gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The fact finder will only consider Plaintiff's age, education, and work experience in the light of his residual functional capacity if the final stage of the analysis is reached. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## III. Relevant Medical Evidence

Records predating the relevant period document treatment for panic disorder, hypertension, restless leg syndrome, and obesity. (ECF No. 8-1, pp. 92-104; ECF No. 8-2, pp. 5-20). Plaintiff received treatment from his primary care physician, Dr. Michael Miranda, to include prescriptions for Ropinirole, Clonazepam, and Paxil.

On June 22, 2018, Plaintiff was involved in an automobile accident, resulting in a highly comminuted[2] mid-shaft clavicle. (ECF No. 8-1, pp. 23-32). He underwent surgical correction on July 9 and initially progressed well. (*Id*. at 84-91, 108-109, 123-124, 153-158, 159-160, 187-188). However, in early October, Plaintiff reported severe pain in his shoulder, reporting that he had attempted to return to work but was unable to lift his shoulder. (*Id*. at 79-80, 161-163, 190). Orthopedic surgeon, Dr. Jody Bradshaw, noted that the fracture appeared to be healing more slowly than expected. Plaintiff also reported severe pain in the trochanter area of his right hip. On

[2] A comminuted fracture is a severe type of break where a bone shatters into three or more pieces. *See* Cleveland Clinic, *Comminuted Fracture*, *at* https://my.clevelandclinic.org/health/diseases/22252-comminuted-fracture (last accessed July 20, 2026).

exam, Plaintiff appeared "down in the dumps," could only elevate his shoulder to about 95 degrees, could only externally rotate the shoulder to 30 degrees, exhibited tenderness along his clavicle, and exhibited tenderness with a good range of motion in the right hip. Because x-rays of the clavicle showed increased boned formation and proper alignment, Dr. Bradshaw prescribed physical therapy to help restore range of motion in the shoulder. (*Id.*).

X-rays of the right hip and shoulder taken in November 2018 showed a CAM shaved femoral head consistent with a possible femoral acetabular impingement and a possible nonunion in the right clavicle. (ECF No. 8-1, pp. 77-78, 164-166, 192-194). Further, a December 2018 CT scan of the shoulder revealed an incompletely healed mid-shaft clavicle with a fracture gap of a few millimeters. (*Id*. at 120-121, 196-197). Accordingly, in January 2019, Plaintiff underwent surgery to repair the nonunion with bone grafting. (*Id*. 69-75, 105-107, 119-120, 169-173, 199). Dr. Bradshaw also prescribed a bone stimulator to be used immediately following surgery. (*Id*. at 63-64, 119, 174-178, 201-202). In follow-up with Dr. Miranda eight days later, Plaintiff indicated he no longer needed to take his Citalopram daily. (ECF No. 8-1, pp. 64-68; ECF No. 8-2, pp. 27-32). Further, Dr. Miranda noted normal behavior with a normal mood and affect.

In early March, Plaintiff indicated that he lost his job due to his inability to use his right arm. (ECF No. 8-1, pp. 61-62, 177-179). At that time, Dr. Bradshaw noted a well healed wound, less tenderness than on previous exams, forward elevation to 90/180 degrees, abduction to 90/180 degrees, external rotation to 30/90 degrees, and an appropriate and cooperative mood and affect. He prescribed a Medrol Dosepak and advised Plaintiff to avoid NSAIDs until the nonunion had fully healed. Thereafter, the Plaintiff began chiropractic treatments with Dr. Jim Schilling. (*Id*. at 36). Plaintiff attended regular appointments with little to no improvement. (*Id*. at 37-46).

By April 2019, the range of motion in Plaintiff's right shoulder had improved and his mood and affect remained pleasant and cooperative. (ECF No. 8-1, pp. 60-61, 117, 180-181, 203). He could elevate to 160 degrees, abduct to 160 degrees, and externally rotate to 45 degrees and x-rays showed union on the bottom 50 percent of the clavicle with callous formation in the gap. However, Plaintiff reported persistent right hip pain prompting Dr. Bradshaw to order further testing. (ECF No. 8-1, pp. 60-61, 117, 180-181, 203). Interestingly, four days later, despite Plaintiff advising Dr. Miranda that his anxiety was worsening due to his inability to work, Dr. Miranda noted normal behavior, mood, affect, and thought content. (*Id*. at 56-60; ECF No. 8-2, pp. 33-37, 51-53). He increased Plaintiff's Paxil dosage and advised therapeutic lifestyle changes, healthier eating habits, and weight loss strategies.

An MRI of Plaintiff's right hip ultimately showed extensive tearing along the anterior one-half of the superior labrum and a periarticular cyst projecting interiorly and medially to the femoral neck. (ECF No. 8-1, pp. 110-112, 204-209). An exam by Dr. Miranda in June revealed tenderness to palpation in the right lateral hip, a decreased range of motion in the right shoulder, and a normal mental status. (ECF No. 8-2, pp. 38-45, 307-313). He prescribed Hydrocodone.

On August 1, 2019, Plaintiff reported continued pain and pinching sensations around his clavicle and acromioclavicular joint area, stiffness in his right shoulder, and difficulty stretching it. (ECF No. 8-1, pp. 182-183). The range of motion in his right shoulder remained unchanged from his last exam, he exhibited discomfort with Neer and Hawkins impingement testing, and he had good strength in the shoulder. However, due to an anterior labral tear in the right hip, Dr. Bradshaw referred him to Dr. Christoper Dougherty. That same month, Dr. Miranda noted tenderness to palpation of the clavicle, a decreased range of motion in the right shoulder, and a normal mental status. (ECF No. 8-2, pp. 299-306). Accordingly, he granted Hydrocodone refills.

Plaintiff consulted with Dr. Dougherty on August 9. (ECF No. 8-2, pp. 59-61, 63-65). The doctor reviewed Plaintiff's MRI results, noted his limping gait, and concluded Plaintiff would benefit from arthroscopic repair of his labral tear. Thereafter, Plaintiff returned to Dr. Miranda with complaints of tailbone pain and requested an adjustment in his Hydrocodone dosage pending his surgery. (ECF No. 8-2, pp. 282-290). At Plaintiff's request, Dr. Miranda agreed to decrease the dosage strength but to allow more frequent dosing. This did not prove helpful, so Dr. Miranda switched him back to his original dosage in October. (*Id*. at 273-281). Upon noting reactive/situational depression and documenting a normal mental status exam, he also referred Plaintiff to psychology. The Plaintiff did not, however, follow through.

On November 4, 2019, Plaintiff presented in the emergency room ("ER") after falling from a tree stand 20 feet off the ground. (ECF No. 8-2, pp. 863-964). He claims that his right hip gave way, causing him to fall. As a result, Plaintiff sustained a laceration to his left knee; head, neck, and back pain; and an abrasion to his left forehead. After the fall, he reported difficulty walking and had to crawl part of the way back to his truck. An exam revealed a decreased range of motion in his cervical, lumbar, and thoracic spine with pain in all areas and spasms in the thoracic and lumbar spine. CT scans of his head, chest, cervical spine, thoracic spine, and lumbar spine and x-rays of his left knee and hand revealed no acute abnormalities.

Plaintiff's right knee pain persisted in December. (ECF No. 8-2, pp. 262-272). Dr. Miranda documented tenderness to the right lateral hip and left anterior knee with a normal mental status. And, on December 20, Plaintiff underwent right hip femoroplasty, labral debridement, and chondroplasty. (ECF No. 8-2, pp. 95-98, 134-136). Despite performing his home exercises, Plaintiff reported worsening pain radiating into his groin area and across his back during his first post-operative follow-up. (*Id*. at 129-131).

That same month, the Plaintiff visited Dr. Kumar Dalai at Mercy Behavioral Health. (ECF No. 8-2, pp. 77-86). He reported PTSD and anxiety resulting from the car accident in 2018, stating that the accident included a fatality. Plaintiff endorsed depressed mood, hopelessness, helplessness, excessive sleep, stress eating (gained 26 pounds since accident), no motivation, anhedonia, flashbacks, nightmares, and difficulty driving due to anxiety. Dr. Dalai diagnosed PTSD, major depressive disorder, and anxiety disorder.

In February 2020, Plaintiff also advised Dr. Miranda of this pain and requested an increase in his pain medication dosage. (*Id*. at 251-261). He said he had been out of medication for six days. An exam revealed mild obesity, tenderness across the lower back more significant on the right side, and a limping gait. Accordingly, Dr. Miranda refilled the Hydrocodone and referred Plaintiff to a pain specialist. One week later, Dr. Dougherty prescribed physical therapy, advising Plaintiff that the weakness he was experiencing in his hip was normal. (*Id*. at 127-129).

On March 6, Plaintiff was treated in the ER following a rollover of his utility terrain vehicle ("UTV"). (ECF No. 8-2, pp. 127-129). Records indicate that he was not wearing a helmet and was ejected from the vehicle, sustaining a contusion to his right arm and a laceration to the scalp. Plaintiff exhibited diffuse tenderness over the right humerus and was unable to move the extremity. However, CT scans of his cervical spine, right humerus, and chest and x-rays of his right elbow were all negative. Three days later, Dr. Dougherty prescribed Mobic to treat his continued right hip pain radiating across his back and into his left hip. (*Id*. at 110-115).

Plaintiff began pain management with Advanced Practical Registered Nurse ("APRN") Karen Reynolds at Optimal Pain and Wellness on March 10, 2020. (ECF No. 8-2, pp. 110-115). Nurse Reynolds noted tenderness, a decreased range of motion, and joint crepitations in both upper extremities; tenderness and a decreased range of motion in both lower extremities; edema in the

right lower extremity; and a normal mental status exam. Plaintiff reported that the Robaxin was helpful, but he indicated his pain medication was not very effective. Accordingly, the nurse increased his Hydrocodone dosage. When he returned in April, Plaintiff again stated that the pain medications barely allowed him to function. (*Id*. at 102-109, 565-572). He reported a pain level of 7 out of 10 after taking his medications as prescribed, which prompted him to take more medication than prescribed. As such, he had been out of medication for a couple of days.

In May, the Plaintiff asked Dr. Miranda to complete a medical source statement to aid him in obtaining disability. (ECF No. 8-2, pp. 230-236). Further, he reported neck pain with tingling discomfort in his right arm. On exam, Dr. Miranda documented tenderness over the lower back, mainly midline; tenderness in the right hip and right clavicle; and a normal mental status exam. As such, he advised Plaintiff to modify his activity but to remain active within reason. Later that month, Plaintiff admitted to Nurse Reynolds that he had been taking his pain medication five times per day and reported that his pain was now 3/10. He continued to exhibit tenderness to palpation of the right upper extremity and lower extremities; a decreased range of motion in his lower extremities with crepitus and pain; normal motor strength and tone in all extremities; normal sensation; a normal gait with the ability to stand without difficulty; and a normal mental status exam. Nurse Reynolds then increased his Hydrocodone dosage to five times daily.

The following month, Plaintiff's urine drug screen was positive for Tramadol and negative for his pain medication. (ECF No. 8-2, pp. 556-559). He claimed the Tramadol was an old prescription he had obtained from another provider but could not explain why no Hydrocodone was detected in the sample. Plaintiff reported taking the medication as prescribed. Despite rating his pain as a 7/10, Nurse Reynolds refused to adjust his Hydrocodone dosage. Plaintiff did not return until September, at which point he rated his pain as 4/10. (*Id*. at 550-555). He reported his

medications were not as effective as he had hoped. Noting an unchanged exam, Nurse Reynolds increased Plaintiff's Hydrocodone quantity to six times daily.

During a follow-up in October, Plaintiff complained of increased pain in his lower back. (ECF No. 8-2, pp. 544-549). He rated his pain as a 4/10 with medication and Nurse Reynolds noted Plaintiff was doing well with his current pain management plan. However, due to Plaintiff's history of taking more medication than prescribed, he was selected for a random pill count in November. (*Id*. at 543). When contacted, Plaintiff indicated that he could not come in because he was out of town. (*Id*. at 969-970). In December, Nurse Reynolds again attempted to have Plaintiff come in for a pill count but learned that the number they had on file for him was no longer his number. (*Id*. at 969-970). A woman answered the phone and indicated she had only had the number for one week. Because he had breached the pain contract, Nurse Reynolds discharged him from service. (*Id*. at 573, 972).

In January 2021, Plaintiff established with Dr. Philip Elangwe for Suboxone treatment. (ECF No. 8-2, pp. 471-487). Dr. Elwange also took over prescribing Clonazepam, Paxil, and Lisinopril. Monthly follow-ups revealed that Plaintiff responded well to the treatment, his hypertension was controlled, and his anxiety disorder and restless leg syndrome stabilized. (*Id*. at 389-442). He consistently denied weakness, nerve pain, numbness, joint pain, and swelling. In June, however, Plaintiff's back pain worsened and Dr. Elwange prescribed a back brace. (*Id*. at 380-384). Further, due to some increased depression in July, the doctor tapered him off the Paroxetine and prescribed Lexapro. (*Id.* at 373-376). At that time, Dr. Elwange noted Plaintiff was not in compliance with his treatment plan.

Due to an assault charge, Plaintiff was ordered to attend anger management therapy. (ECF No. 8-2, pp. 597-599). On September 28, 2021, Plaintiff met with Dr. Monty Atchley at

Stonehaven Behavioral Health. Dr. Atchley diagnosed Plaintiff with post-traumatic stress disorder resulting from the auto accident in 2018, generalized anxiety disorder, panic disorder, and major depressive disorder. Plaintiff indicated he was excited to make peace with the accident. Weekly appointments continued through November, at which time the Plaintiff completed his court ordered treatment. (*Id*. at 589-596).

In October, Plaintiff followed up with Dr. Elwange. (ECF No. 8-2, pp. 351-354). He reported increased back pain after trying to get out of his boat. Dr. Elwange noted he was limping, but an exam was otherwise unremarkable and refilled all his medications. By December, Plaintiff's pain had decreased to 3/10, but he reported worsening depression. (*Id*. at 340-350). Dr. Elwange tapered him off the Lexapro and prescribed Wellbutrin. Records indicate that he did not tolerate the Wellbutrin and required a prescription for Viibryd in December. (*Id*. at 332-335). His pain remained 3/10.

Plaintiff reported an increase in back and hip pain resulting in numbness in his feet. (ECF No. 8-2, pp. 627-633). He rated his pain as 6/10. Dr. Elangwe's APRN Presley Phillips noted he was doing well on the Viibryd, prescribed Vraylar, and refilled all other medications. And, in February, Plaintiff voiced no concerns and Dr. Elangwe noted he was doing well on the Vraylar. (*Id*. at 624-625).

An MRI of Plaintiff's lumbar spine conducted in March 2022 showed a right asymmetric disk bulge at the L5-S1 level with face degeneration resulting in mild central canal stenosis and moderate right neural foraminal stenosis as well as straightening of the normal lumbar lordosis. (*Id*. at 636, 650). Accordingly, Dr. Elangwe referred Plaintiff to neurosurgery. (*Id*. at 610, 614-617).

Later that month, in follow-up with Dr. Miranda, Plaintiff indicated he was not going to continue Suboxone treatment because it did not provide adequate pain relief. (ECF No. 8-2, pp. 665-668). He also admitted that he had been fired from his previous pain management provider. At Plaintiff's request, Dr. Miranda completed a medical source statement and referred him to pain specialist Dr. Brett Whatcott. He also agreed to refill his Hydrocodone until he could see Dr. Whatcott. (*Id*. at 661-668).

Plaintiff conferred with Dr. Whatcott at Arkansas Pain Specialists on May 24, 2022. (ECF No. 8-2, pp. 1165-1169). An exam revealed an antalgic (limp) gait, tenderness, and a painful, restricted range of motion in the right upper extremity as well as tenderness, a painful range of motion, and pain on weigh bearing in the right lower extremity. Plaintiff reported that treatment via Hydrocodone worked well for him, but Dr. Whatcott advised that he preferred not to prescribe opioids to younger individuals. He did, however, agree to temporarily prescribe Hydrocodone while Plaintiff considered a right suprascapular nerve block/ablation and right hip injections. When the Plaintiff returned in June and July, he was treated by APRN Brandon Faulkner. (ECF No. 8-2, 1156-1165). Nurse Faulkner wanted to administer lumbar epidural steroid injections ("LESI"), but because the Plaintiff was on Medicaid, he ultimately referred Plaintiff to Dr. Goodman. (*Id*. at 1151-1156). Nurse Faulkner indicated that surgery was not recommended at this time. He also consistently noted that the Plaintiff continued to work full-time in heavy labor and refilled his Hydrocodone and Cyclobenzaprine. (*Id*. at 1134-1156).

Plaintiff followed up with Dr. Atchley at Stonehaven Behavioral on June 8, reporting PTSD, severe anxiety, and moderate depression since the auto accident. (ECF No. 8-2, pp. 1190).

On December 5, Nurse Faulkner's records indicate that Dr. Goodman administered Plaintiff's first LESI. (ECF No. 8-2, pp. 1134-1138). However, the injection was not successful. (*Id*. at 1120-1125).

In January 2023, Plaintiff's right-sided radiculopathy worsened, radiating down into his foot. (ECF No. 8-2, pp. 1125-1129). Nurse Faulker ordered an MRI of his lumbar spine. Plaintiff voiced his interest in hip injections but stated he could not afford them. At that time, an exam showed an antalgic gait; tenderness to palpation with a painful and restricted range of motion in the right shoulder; tenderness to palpation with a painful range of motion and positive straight leg raise in right lumbar spine; and tenderness to palpation and a painful range of motion with weight bearing in the right hip. The MRI ultimately showed a right posterior-lateral small disk protrusion at the L5-S1 level that abutted and possibly compressed the nerve root in the right lateral recess. (ECF No. 8-2, pp. 1170). Accordingly, Nurse Faulkner prescribed physical therapy and indicated that spinal cord stimulation ("SCS")/targeted drug delivery ("TDD") would likely be the best long-term option for him. As such, the nurse indicated he would begin weaning Plaintiff off the opioids on his next visit. (*Id*. at 1115-1120).

Plaintiff was treated in the emergency room on April 1 for complaints of elevated blood pressure, dizziness, and chest pain. (ECF No. 8-2, pp. 1002-1067). His wife indicated that he had gone off his medication for approximately one week but restarted the medication a few days earlier. Cardiac enzymes, chest x-rays, and an EKG were normal, and an exam revealed the Plaintiff to be anxious. Believing the main cause of his symptoms to be anxiety, the doctor released Plaintiff with a prescription for Lisinopril and an appointment for a stress test.

On April 24, 2023, Plaintiff advised Nurse Faulkner that he had not heard from physical therapy ("PT"). (ECF No. 8-2, pp. 1111-1115). However, when contacted, PT advised Nurse

Faulker that they had attempted to contact Plaintiff several times. Nurse Faulkner again voiced his recommendation that Plaintiff pursue SCS/TDD and he reduced Plaintiff's opioid dosage.

Unhappy with the decreased dosage, Plaintiff reported taking more medication than was prescribed at his next appointment. (*Id*. at 1106-1110). Further, he indicated he had not started PT because his truck had broken down. Nurse Faulkner noted, however, Plaintiff made it to his appointment without difficulty and was also able to go fishing, having shown the nurse pictures from the previous weekend. Due to his noncompliance and an abnormal drug screen, Nurse Faulkner discharged him from care.

Plaintiff presented to APRN Billy Noel at Health and Wellness in June stating he had been released from Arkansas Pain Specialists because he did not attend PT. (ECF No. 8-2, pp. 998-999). He claimed he was not aware of the PT order. Further, Plaintiff indicated he had received a lumbar injection 12 days earlier and it was helpful. After noting joint pain, myalgia, and weakness, Nurse Noel refilled Plaintiff's medications and scheduled him for monthly visits. (*Id*. at 992-993, 996-997). In October, Plaintiff reported some improvement in his neck and back pain but continued to exhibit a decreased range of motion. However, he also admitted to wearing heavy work boots. (*Id*. at 990-991). Nurse Faulkner ordered MRIs of his right hip and neck.

The following month, Plaintiff complained of right shoulder pain aggravated by movement. (ECF No. 8-2, pp. 990-991). An exam revealed a decreased range of motion, pain, and weakness. In mid-December, Plaintiff presented in the ER with complaints of left calf pain. (*Id*. at 975-981). Tenderness was noted over the medial calf and dorsiflexion, and plantar flexion of the foot exacerbated the pain. The ER doctor ultimately diagnosed soft tissue injury, likely calf strain and recommended compression and NSAIDs. He advised Plaintiff to avoid any strenuous activity for the next two days and then gradually return to normal activities such as walking.

Plaintiff continued monthly pain management with Nurse Noel through March 2024. (ECF No. 8-2, pp. 984-985). Records indicate he continued to complain of right shoulder, right elbow, right hip, and neck pain and receive Hydrocodone. (*Id*. at 1101-1103, 1184-1187). In February, Nurse Noel administered a trigger point injection into his left elbow, which he reported aggravated the pain.

Plaintiff reestablished with Dr. Atchley in March 2024. (ECF No. 8-2, pp. 1191-1192). Following an evaluation, he diagnosed Plaintiff with PTSD, generalized anxiety disorder, panic disorder, major depressive disorder, and bipolar I disorder. Plaintiff reported anger, mood swings, and keeping to himself. Aside from this evaluation and records from the anger management therapy the Plaintiff was court ordered to complete; there are no records documenting formal mental health treatment. Additionally, there is nothing in the record to indicate that the Plaintiff's PTSD, anxiety, and depression were ever of such severity as to necessitate inpatient services.

## IV. Discussion

Plaintiff raises three issues in this appeal: (1) whether the ALJ fully and fairly developed the record; (2) whether the ALJ's RFC determination is supported by substantial evidence; and (3) whether the ALJ erred in her hypothetical questions to the vocational expert ("VE"). Following a thorough review of the record, the undersigned finds that the ALJ's decision to deny benefits is supported by substantial evidence.

### A. Development of the Record

Due to the lengthy history of this case at the agency level, Plaintiff argues that the ALJ should have either ordered a consultative examination or resubmitted the case to agency physicians for a more recent RFC. While the ALJ does have a duty to a claimant to develop the record fully and fairly to ensure that her decision is an informed decision based on sufficient facts, the ALJ is

only required to develop a reasonably complete record. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004); *see also Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (citing *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994)). While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).

Contrary to the Plaintiff's argument, the record contains ample evidence upon which the ALJ could base his RFC determination. The transcript contains two physical and mental assessments completed by agency physicians, medical source statements completed by two of Plaintiff's treating physicians (one source completed two), and medical records spanning from 2017 until 2024. While Plaintiff would have us remand the case merely because the ALJ discounted the most recent RFC assessments which were from his treating physicians, this is neither based on statute nor precedent. In *Bonham v. Bisignano*, 177 F.4th 934, 942 (8th Cir. 2026), the Eighth Circuit dispelled the proposition that the ALJ must base his RFC assessment on a medical professional's opinion regarding the Plaintiff's functionality. The Eighth Circuit clarified precedent stating, "we do not suggest that an ALJ must in all instances obtain from medical professionals a functional description that wholly connects the dots between the severity of pain and the precise limits on a claimant's functionality. Something, however, is needed." *Id.* (citing *Noerper v. Saul*, 964 F.3d 746 (8th Cir. 2020)). Section 404.1545(a)(3) and case law make clear that the "something" may be based on reliable objective medical data such as clinical examinations and diagnostic imaging and need not include a medical professional's opinion regarding the claimant's functionality. *Id.*; 20 C.F.R. §404.1545(a)(3). Therefore, we find the

ALJ properly assessed Plaintiff's RFC based on *all* the relevant medical and other evidence in the record.

The Court is also not persuaded that the record required further development concerning Plaintiff's mental RFC. While we note that the record contains only one formal mental health treatment note, assessments from two agency physicians who concluded Plaintiff's mental impairments were not severe, and the opinion of one treating physician, Plaintiff's assertion that an RFC determination may not be based on inferences drawn from objective medical data is incorrect. *Bonham*, 177 F.4th at 941. We find that the ALJ properly relied upon medical records from his primary physician detailing the treatment Plaintiff received for his anxiety and depression, as well as the assessments of other physicians who noted his mental status. The Plaintiff's failure to seek out consistent mental health treatment does not require the ALJ to order a consultative exam, as it is the Plaintiff's burden to prove he is disabled.

Additionally, the record contains a Cooperative Disability Investigations Unit investigative report resulting from an investigation of the Plaintiff for possible disability fraud.[3] (ECF No. 8-2, pp. 139-228). Said report indicates that the Plaintiff organized and participated in fishing tournaments and hunted regularly from 2018 through September 2020.[4] *See Huskey v. Colvin*, 2014 SL 4167412 at * 3 (E.D. Ark. Aug. 21, 2014) (although fishing and a disability are not necessarily mutually exclusive, the claimant's decision to go fishing tends to suggest that the alleged symptoms and limitations may have been overstated.); *Wilson v. Astrue*, 2009 WL 1811879 at *15 (E.D. Mo. June 25, 2009) (ALJ could consider that clamant went hunting and

---

[3] The report indicates that the investigation was prompted by an anonymous tipper concerned that the Plaintiff had applied for disability. (ECF No. 8-2, pp. 139-228).

[4] Records from the Arkansas Game and Fish Commission reveal consistent purchases of fishing and hunting licenses dating back to before Plaintiff's alleged onset date. In 2019, he killed a turkey and six deer.

fishing); *Neely v. Shalala,* 997 F.2d 437, 439 (8th Cir. 1993) (hunting noted to be one factor inconsistent with allegations of total disability). This is corroborated by medical evidence indicating Plaintiff fell from a tree stand in November 2019 (ECF No. 8-2, p. 893), was involved in a UTV accident in 2020 (*Id*. at 127-129), injured his back while getting out of his boat in 2021 (*Id*. at 351-354), and showed Nurse Faulkner pictures of a recent weekend fishing trip in 2023 (*Id*. at 1106-1110). Further, the report contains snapshots of Plaintiff's Facebook postings indicating that he frequently fished in fishing tournaments[5], often winning prize money, and frequently hunted despite his allegations of disabling pain, PTSD, depression, and anxiety.

Additionally, after filing for disability, Plaintiff worked in a lawn care business and performed odd jobs for cash payment. (ECF No. 8-2, pp. 140, 142). The investigative report documented Plaintiff's Facebook posts wherein he advertised his lawn services. And, while surveilling Plaintiff's home, the investigator noted an orange utility trailer loaded with a zero-turn mower and mowing equipment parked underneath a freestanding carport. (*Id*. at 148). Plaintiff's ex-wife told the investigator that he mowed for a mail carrier, the two different families, a duplex, and a trailer park. (*Id*.). Working at a job while applying for disability benefits is an activity inconsistent with complaints of disabling pain. *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996). In addition, working generally demonstrates an ability to perform a substantial gainful activity. *Naber v. Shalala*, 22 F.3d 186, 188-89 (8th Cir. 1994).

**B. RFC Determination**

Next, the Plaintiff avers that the ALJ's RFC assessment is not supported by the record because the ALJ relied on her own lay opinion. RFC is the most a person can do despite their

[5] The report indicates that Plaintiff participated in fishing tournaments twice monthly in 2018 and 2019 and frequently in 2020. (ECF No. 8-2, pp. 145, 146-147).

limitations. 20 C.F.R. § 404.1545. Although the RFC must be supported by *some* medical evidence that addresses the claimant's ability to function in the workplace, it is an administrative determination left to the ALJ. *Montgomery v. O'Malley*, 122 F.4th 1059, 1064 (8th Cir. 2024) (holding RFC is ultimately an administrative determination reserved to the SSA) (citations omitted); *see also Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) (holding RFC must be supported by some medical evidence). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations," including symptoms such as pain. *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009).

In addition to the medical evidence detailed in the Relevant Medical Evidence section of this recommendation, the record contains physical RFC assessments completed by two agency physicians and medical source statements from two of Plaintiff's treating physicians. In May 2019, Dr. Cheryl Snyder reviewed the record evidence and concluded Plaintiff could perform a full range of light work. (ECF No. 8, pp. 108-111, 120-123). Following an independent review in September 2019, Dr. William Harrison concluded the same. (*Id*. at 138-141, 152-155).

In May 2020, Dr. Miranda completed a very restrictive medical source statement ("MSS"). (ECF No. 8-2, pp. 119-121). He opined that the Plaintiff could lift/carry up to 10 pounds; sit for a total of 2 to 3 hours per workday; stand and/or walk continuously for 1 hour before needing a 20 minute break; climb balance, squat, kneel, crouch, bend, stoop, reach in all directions, handle finger, grip, and feel for less than 1/3 of the day; and must avoid all exposure to environmental factors. Additionally, Dr. Miranda indicated Plaintiff would need to elevate his lower extremities

3 times per day, lay in a supine position for 4 hours per day, and could only perform work activities for 1 hour per day, 20 minutes continuously.

That same month, Dr. Dougherty restricted Plaintiff to lifting less than 10 pounds; standing and walking 4 hours per day; sitting 8 hours; and climbing, balancing, squatting, kneeling, crouching, bending, stooping, reaching in all directions, handling, fingering, gripping, and feeling less than 2 hours per day. (ECF No. 8-2, pp. 122-123). Additionally, he opined that the Plaintiff should avoid all exposure to environmental elements and hazards and avoid concentrated exposure to wetness, humidity, noise, and vibration.

In April 2022, Dr. Miranda completed a second MSS. (ECF No. 8-2, pp. 582-584). This time, the doctor limited Plaintiff lifting less than 10 pounds; sitting for 2 hours; standing and walking for 1 hour; climbing, balancing, squatting, kneeling, crouching, bending, stooping, reaching in all directions, handling, fingering, gripping, and feeling for less than 1/3 of the day. Dr. Miranda also concluded he should avoid all exposure to environmental elements, noise, vibration, and hazards.

The ALJ found the opinions of Drs. Miranda and Dougherty to be unpersuasive. She concluded that Dr. Miranda's assessments appeared to be based on Plaintiff's subjective complaints rather than the objective medical evidence. (ECF No. 8, p. 28). Dr. Miranda's examination of the Plaintiff in May 2020 only documented tenderness across Plaintiff's lower back, right hip, and right arm but no findings that would support the restrictive findings. (ECF No. 8-2, pp. 230-236). Further, his treatment note dated April 2022 revealed general musculoskeletal tenderness in right mid clavicle and right lumbosacral area but no other abnormalities. (*Id*. at pp. 661-664).

ALJ McGee discredited Dr. Dougherty's statement because he completed a checkbox form and failed to provide an objective basis or rationale for his severe restrictions. (ECF No. 8, p. 29). She found no objective medical evidence to support such a restrictive assessment. Records indicate that after the clavicle revision surgery and the surgery on his hip, none of the Plaintiff's impairments warranted surgical intervention, hospitalization, or emergency treatment. Rather, Plaintiff's treatment was conservative in nature, relying on narcotic pain medication, an epidural lumbar steroid injection, and a trigger point injection into his left elbow to control his chronic pain. Plaintiff was also non-compliant, having been discharged from at least two pain management clinics for taking more medication than prescribed, having an inconsistent urine drug test, and/or failing to present for random pill counts as instructed.

Perhaps the most damaging, however, is Plaintiff's activity level. Evidence indicates that he stayed busy organizing and attending fishing tournaments and mowing lawns for cash. (ECF No. 8-2, pp. 139-228). And we note that fishing requires the use of both upper extremities to cast and reel, fine motor skills to tie strong and secure knots and to switch out baits, good core strength and balance to either stand on a boat or wade in the river for extended periods, the ability to both sit for extended periods; and the ability to maintain concentration and persist.

The investigative report also contains an allegation that the Plaintiff was selling his Hydrocodone, which could explain why he ran short on medication, why at least one of his urine drug tests showed no Hydrocodone in his system, and why he consistently reported increasing pain levels and requested an increase in the quantity of Hydrocodone prescribed despite no objective changes on examination. (*Id.*). Moreover, the Plaintiff reportedly told many people that he did not want to work, but rather, he wanted to fish and hunt daily as his job.

At the administrative hearing before ALJ McGee, the Plaintiff attempted to mitigate the damage to his case caused by the evidence of his frequent fishing and hunting. (ECF No. 8, pp. 63-68). He testified that he had last fished two weeks prior, claiming that he sits down for a while, stands up for a while, and then lays down in the boat because he "can't do it." Further, the Plaintiff indicated that he must cast left-handed and needs assistance carrying the fish. As for hunting, he reported that the last time he hunted in a tree stand was when he fell. When he does hunt, Plaintiff stated that he must shoot left-handed. (*Id*. at 65). And, when he kills a deer, his brother does all the work. Moreover, the Plaintiff claimed that he had not performed lawn work "in a long time" and the advertisements on Facebook were for his brother's business. However, when questioned by his attorney regarding his ability to fish from a boat, the Plaintiff back tracked and stated that he could not fish in a boat because he is unable to "pull the boat back." (*Id*. at 67). Accordingly, the undersigned finds the ALJ's decision to discredit Plaintiff's testimony is supported by good reasons and substantial evidence. *See Chaney v. Colvin*, 812 F.3d 672, 677 (8th Cir. 2016) (reversal based on ALJ's erroneous credibility related inference is warranted only where rest of record does not support credibility determination).

Contrary to the Plaintiff's argument, the ALJ is not required to have a medical professional's functional description that connects the dots between the severity of pain and the Plaintiff's ability to perform work activities. *Bonham*, 177 F.4th at 942. The ALJ is allowed to rely on objective medical data such as clinical examinations and diagnostic imaging. *Id*. And, in the present case, the ALJ had substantial evidence, both medical and activity reports, to support her conclusion that the Plaintiff could perform light work requiring occasional climbing, stooping, kneeling, crouching, and crawling.

With respect to Plaintiff's mental impairments, the record contains assessments completed by agency physicians in May and September 2019 concluding Plaintiff's mental impairments were not severe. (ECF No. 8, pp. 106-107, 118-119, 136-137, 150-151). Additionally, Dr. Miranda completed a mental MSS in April 2022 indicating the Plaintiff has no useful ability to function on a sustained basis in the following areas: remembering locations and work-like procedures; understanding, remembering, and carrying out very short and simple instructions; maintaining attention and concentration for extended periods; performing activities within a schedule; maintaining regular attendance; being punctual within customary tolerances; sustaining an ordinary routine without supervision; responding appropriately to supervision, co-workers, and usual work settings; working in coordination with or proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; responding appropriately to changes in the work setting; setting realistic goals or making plans independently of others; following work rules; functioning independently; relating predictably in social situations; demonstrating reliability; working without deterioration or decompensation causing the individual to withdraw from the situation; and working without deterioration or decompensation causing exacerbation of symptoms or adaptive behaviors.

The ALJ ultimately found Dr. Miranda's opinion unpersuasive because he failed to include the rationale or basis for his assessment, mental health was not his area of expertise, and the assessment was not supported by Plaintiff's treatment notes. Dr. Miranda consistently noted a

normal mental status exam. (ECF No. 8-2, pp. 21-45, 51-53, 230-236, 251-313, 661-668). In fact, in May 2023, he even indicated Plaintiff was not taking medication for his depression, as it was currently stable. (*Id*. at 1070-1098).

ALJ McGee also noted that Plaintiff's PTSD, anxiety, and depression were treated primarily by his primary care physician via medication management. (ECF No. 8, p. 27). Except for a few notations of a euthymic or anxious mood, his treating physicians documented a normal mood, affect, behavior, and thought content. Plaintiff had no inpatient admissions and sought out emergency treatment for his anxiety on only one occasion. (ECF No. 8-2, pp. 1002-1067). In September 2021, he began attending court-ordered anger management therapy. (*Id*. at 589-599). Upon completion in November, Plaintiff reported that therapy "really helped" him. (*Id*. at 589-90). Plaintiff did not return to Dr. Atchley's office until June 2022, at which time the doctor listed his diagnoses as PTSD, generalized anxiety disorder, panic disorder, and major depressive disorder and indicated that his treatment goals and outcome were achieved. (ECF No. 8-2, pp. 1190). There are no notes from the visit. Additionally, he re-established with Dr. Atchley in March 2024, reporting the need for additional therapy to help him process trauma from the 2018 accident. (ECF No. 8-2, pp. 1191-1192). However, this was merely an intake assessment with no treatment notes.

In concluding that the Plaintiff could perform simple, routine, and repetitive tasks involving usual work situations, routine work changes, and routine but superficial social interaction (ECF No. 8, p. 21), the ALJ also considered Plaintiff's ability to organize and participate in fishing tournaments, hunt, ride his UVT, and perform lawn work. Records indicate that he fished and hunted with a partner and organized many fishing tournaments, which requires the ability to work with others, coordinate the competition format, secure location permits, manage angler safety, execute a weigh-in or catch-photo-release process, and coordinate prize distribution.

Riding his UVT also required the ability to operate a motorized vehicle and withstand intense vibrations. Therefore, the ability to engage in these types of activities suggests the Plaintiff was not as limited as alleged.

Accordingly, we find substantial evidence to support the ALJ's RFC determination.

### C. Step Five Analysis

In his final argument, the Plaintiff posits that the hypothetical question posed to the vocational expert contained slightly different language than the RFC with respect to Plaintiff's mental limitations. We disagree. At the hearing, the ALJ asked the VE whether there would be any light work available to an individual of Plaintiff's age, education, and work history who could perform unskilled work,[6] which she defined as the ability to apply common sense understanding to carry out instructions furnished in written or oral diagrammatic form, deal with problems involving several concrete variables entered from standardized situations and have routine and superficial social interaction. (ECF No. 8, pp. 69-70). In her opinion, ALJ McGee concluded Plaintiff could perform light work involving only occasional climbing, stooping, kneeling, crouching, and crawling; simple, routine, and repetitive tasks involving usual work situations and routine work changes; and routine but superficial social interaction. Despite the differences in verbiage, the overall sentiment is clear. ALJ McGee asked the VE to identify unskilled work which is consistent with the RFC contained in her opinion.

While we note that the ALJ included reaching limitations in the question posed to the VE but not in her opinion, the VE testified that the Dictionary of Occupational Titles does not specifically address reaching. (ECF No. 8, p. 70). Therefore, she used her professional experience

---

[6] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." *See* 20 CFR §§ 404.1568, 416.968 and SSR 83-10.

to identify positions that would fit the hypothetical. Because the jobs the VE identified are the positions the ALJ concluded Plaintiff could perform, the absence of a reaching restriction in her official RFC determination is not reversible error.

## V. Conclusion

For the reasons and upon the authorities discussed above, it is RECOMMENDED that the ALJ's decision be affirmed, and that the Plaintiff's Complaint (ECF No. 2) be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in a waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED on this 27th day of July 2026.

/s/ Mark E. Ford
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE